**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**NORTHERN DIVISION AT COVINGTON**

**UNITED STATES OF AMERICA** **PLAINTIFF**

**v.** **CRIMINAL ACTION NO.: 26-1-DLB**

**SENTENCING MEMORANDUM**

**BENJAMIN AARON KEEBLER** **DEFENDANT**

Had Benjamin Keebler been properly diagnosed, treated, and medicated for bipolar disorder, it is doubtful he would be appearing in front of this Court to be sentenced for crimes he did commit and knew were wrong. Moreover, Mr. Keebler is a good candidate for community-based treatment under the strict supervision of his treating medical professionals and the United States Probation Office. That is Dr. Connor's assessment of Mr. Keebler, and for the those reasons and the reasons to be discussed, Mr. Keebler respectfully requests this Court sentence him to a term of probation for five years, order him to comply with all treatment recommendations – including medication, 500 hours of community service, a nominal fine, and order him to write an apology letter to his victims and their staff.

## UNRESOLVED OBJECTIONS AFFECTING THE GUIDELINES RANGE

Before turning to the 3553(a) factors, there is an unresolved objection affecting the guidelines range. As calculated by John D'Alessandro, the guidelines call for a sentence of 51-63 months. PSR ¶91. While Mr. Keebler preserved his right to object to the six-point enhancement, Mr. Keebler withdraws his objection to the six-point enhancement. Based on all available information, Mr. Keebler believes the United States could meet its burden by a preponderance of the evidence.

## THE 3553(a) FACTORS

The guidelines are advisory in nature. *U.S. v. Booker*, 543 U.S. 220, 259 (2005). However, the guidelines remain "the starting point and initial benchmark in sentencing." *Gall v. U.S.*, 552 U.S. 38, 49 (2007). However, a court may determine that a sentence outside of the guidelines framework is warranted based upon the statutory sentencing factors found at 18 U.S.C. § 3553(a) …. *Rita v. U.S.*, 551 U.S. 338, 344 (2007). Even still, the guidelines application statements provide that courts shall first determine the guideline range, then consider departure policy statements, then consider 18 U.S.C. § 3553(a) factors as a whole. *See* USSG § 1B1.1(a)–(c).

Turning first to Section 3553(a), Section 3553(a) directs the sentencing court to "impose a sentence sufficient, but not greater than necessary" to comply with the purposes of sentencing. Those purposes are:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

> In determining the appropriate sentence to be imposed, the court is also to consider:
>
> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(3) the kinds of sentences available;

(4) the guideline sentencing range;

(5) any pertinent policy statements issued by the Sentencing Commission;

(6) the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct;

(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

In this case, the Mr. Keebler pleaded guilty to leaving a series of voicemails and phone calls intended to harass and intimidate United States Congressman 1. These included a February 21, 2023 voicemail stating in part: “Live by the gun. Die by the gun boy.” R. 19: Plea Agreement ¶ 4(b)(i). The Defendant also pleaded guilty to making a threatening interstate communication by calling the office of United States Senator 1 and threatening to “come to [Senator 1]’s house and do a . . . hammer visit.” R. 19: Plea Agreement ¶ 4(c).

These statements, along with his other relevant conduct, reflect a certain level of derangement on Mr. Keebler’s part. The person that made these threats is not the same person Mr. Keebler is today. What accounts for this difference between Mr. Keebler at the time he committed the offenses and who he is today? Well, Mr. Keebler has received a diagnosis for bipolar disorder, started taking medications designed to help him, and committed himself to his treatment and ongoing mental health. Consider the language of Dr. Connor’s report that: “

> “Ben is a 55-year-old male with a history of undiagnosed Bipolar Disorder. His wife Jennifer clearly defined Ben's severe mood swings with bouts of insomnia, agitation, depression and paranoia often seen with psychiatric patients who meet

> the criteria for Bipolar Disorder. Ben also accurately described the Bipolar symptoms. It is also apparent that when Ben is medication compliant, his mood swings are less pronounced, and his cognition is more intact and anchored in reality. Noteworthy, is that Ben stated that he was not on any psychotropic medication when he made the harassing communications. This statement was independently confirmed by his wife Jennifer."

Mr. Keebler, at the time he committed his crimes, was clearly filled with rage. Dr. Connor continues:

> "Problematic, is that the aggressive and divisive political zeitgeist acted as an "organizing principle" for Ben's bouts of agitated mania and depression. In other words, Bens perception of the current aggressive and divisive political climate provided him with a reality-based "target" to project his agitated depression and mania onto. With that being said, it is my clinical opinion, that at no time throughout this evaluation did Ben attempt to "blame" his maladaptive aggressive behavior on his chronic mental illness. Despite Ben being off his medications at the time of the offenses, it is also my clinical opinion that even though he experienced bouts of agitated mania and depression, he still knew the difference between right and wrong. His agitated mania was projected onto specific political figures and their political ideologies as a means of catharsis in an erroneous attempt to organize his internal emotional turmoil. In fact, when Ben was asked by this Examiner if he would have made the harassing phone calls if a police officer was standing at his elbow, he immediately responded "probably not:" thus solidifying his understanding of the difference between right and wrong and his criminal culpability at the time the offense."

Dr. Connor's evaluation took place earlier this year and reflects the personal growth that Mr. Keebler has undergone. Mr. Keebler has clearly recognized he caused his own actions, has not sought to blame his mental health issues or his victims for his actions, and needs to put this matter behind him for his and his family's well-being.

Mr. Keebler is, first and foremost, a family man. While his crimes give the impression he is a callous and cruel man, the opposite is true: he cares deeply for his country and his loved ones. Like the changes in himself, Mr. Keebler's family dynamic has recently changed: he recently became the primary caregiver for his young son, J.K., 11 years old, after the child's mother dropped J.K. off to live with his father with little to no notice. PSR ¶57. Throughout

these struggles and changes, there has been a constant in Mr. Keebler's life, his wife, Jennifer Keebler. Jennifer has seen Mr. Keebler at his worst, actually experiencing the "mania" and "depression" in all too real cycle. PSR ¶70. Her letter of support is attached to this memorandum and expresses her hope for the future and the changes she has observed in Mr. Keebler since meeting with Dr. Connor, becoming properly medicated, and continuing with his treatment. Mr. Keebler's sister's, Maia Parr, letter is also attached in support of this memorandum.

It is also important to note that no where in the discovery does it appear that Mr. Keebler actually intended or otherwise prepared to "make good" on his threats. He has never owned firearms, and is not a violent person

So what does all of this say about why probation is appropriate in Mr. Keebler's case? Mr. Keebler clearly recognizes the seriousness of his offenses. Mr. Keebler respects this Court and the law: he has shown that in his conduct since being released on bond, and by his prompt plea in this matter, allowing the government to allocate its resources effectively. But what is "just" punishment?

Punishing someone with incarceration can be understood as a way to deter criminal conduct. But Mr. Keebler has no need of specific or general deterrence. Mr. Keebler is in the lowest risk to recidivate according to the U.S.S.C. where he falls in the Group A category of only a 6.8% chance to reoffend because he has no prior arrests. PSR ¶42-52. *See: Recidivism and the "First Offender"*, ussc.gov (May 2004), https://www.ussc.gov/research/research-publications/recidivism-and-first-offender. Moreover, he has addressed the underlying issues that created negative influences in his life and is committed to maintaining his mental health treatment and medication in the future.

There are no markers in the PSR or the record that suggest or even hint that Mr. Keebler will ever repeat his conduct that led to his conviction in the present case or any other criminal behavior. Mr. Keebler is not a danger to the public. As previously mentioned, even in his manic and depressed state, Mr. Keebler never showed any sign of following through on his threats. His relevant conduct also ended before the indictment and arrest in the present case on May 5, 2025. PSR ¶15.

Incarceration would also serve the opposite goal of one of the stated goals of criminal justice: rehabilitation. Mr. Keebler needs no vocational or educational training. He has a masters degree. PSR ¶77. Mr. Keebler also has a good paying job at Infinite Computer Solutions. PSR ¶81. As Dr. Connor's report indicates, Mr. Keebler is amenable to community-based treatment, and he has already taken steps to continue in his mental health journey. Incarceration would destroy Mr. Keebler's earnings and harm his family's well-being as he is the primary breadwinner.

The United States Probation Office can effectively monitor Mr. Keebler's treatment of his bipolar disorder. Probation is not a get-out-of-jail free card. It will not diminish the seriousness of Mr. Keebler's crimes. Instead, probation will allow this Court to reinforce respect for the laws of the United States by showing him mercy and guidance and a way forward while acknowledging what brought him here. He will be constantly monitored and required to abide by the rules of probation. He will live with the knowledge that his freedom is only by the grace of this Court and that every day is an obligation to be a productive member of society and not reoffend.

Probation is authorized by statute, even where the guidelines do not authorize it. PSR ¶97-99. Probation would also not be an unwarranted sentencing disparity. One could argue that

all of the mitigation presented above would strongly indicate that probation is warranted, but also, this Court has considered a similar-in-essence case and granted probation. In *U.S. v. Brian William Delafayette*, 21-CR-27-DLB-CJS, this Court granted probation to the defendant. Granted, his guidelines were in Zone "A" of the sentencing table and probation was authorized under the guidelines, but the facts and similarities are close to this case. Both Mr. Delafayette and Mr. Keebler suffer from bipolar disorder, and both were angry about the state of the politics in the United States. While Mr. Keebler's threats were spread over a few years and Mr. Delafayette's criminal conduct was limited to a single instance, one could argue that a threat of a bomb at a popular tourist attraction would inspire terror for any parent or employee forced to evacuate the attraction while the bomb hoax was investigated.

## THE FINE

Mr. Keebler is not a wealthy man. While he previously enjoyed two high paying jobs, he was let go from his job at Hub International earlier this year. PSR ¶81. Mr. Keebler will ultimately make a request for an appropriate fine at the time of sentencing.

## CONCLUSION

In conclusion, Mr. Keebler respectfully requests this Court sentence him to a term of probation for five years, order him to comply with all treatment recommendations – including medication, 500 hours of community service, a nominal fine, and order him to write an apology letter to his victims and their staff and impose a fine and whatever conditions of probation the Court determines are appropriate. In the alternative, if the Court is not inclined to grant probation, Mr. Keebler will argue in the alternative at the time of sentencing for a downward variance based on the reasons discussed in this memorandum.

Respectfully submitted,

/s/ Marvin Knorr

Marvin Knorr III

7 West 7th St.
Covington, KY 41011
859.992.6405 Phone
marvin@marvinknorrlaw.com
Counsel for Defendant

CERTIFICATE OF SERVICE

I certify that on July 23, 2026, I filed the foregoing with the clerk's office, which thereafter filed it and sent notice to all parties.

/s/ Marvin Knorr

Marvin Knorr III